# YOUNG *v.* CLARENDON TOWNSHIP.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF MICHIGAN.

No. 34. Argued October 23, 1889. — Decided December 9, 1889.

It is settled law that a municipality has no power to issue its bonds in aid of a railroad, except by legislative permission.

The legislature in granting permission to a municipality to issue its bonds in aid of a railroad may impose such conditions as it may choose.

Where authority is granted to a municipality to aid a railroad and incur a debt in extending such aid, that power does not carry with it authority to execute negotiable bonds except subject to the restrictions and directions of the enabling act.

The act of the legislature of Michigan of March 22, 1869, " to enable any township, city or village to pledge its aid by loan or donation to any railroad company, etc.," provided that the bonds when " issued " should be " delivered by the person . . . having charge of the same to the treasurer of this State; " that the treasurer should " hold the same as a trustee for the municipality issuing the same and for the railroad company for which they were issued;" that whenever the railroad company should " present to said treasurer a certificate from the governor of this State that such railroad company has in all respects complied with the provisions of this act . . . such of said bonds as said company shall be entitled to receive shall be delivered to said company;." that the treasurer should endorse upon each bond delivered the date of its delivery and to whom it was delivered; and that in case the bonds were not demanded in compliance with the terms of the act within three years from the date of delivery to the treasurer, " the same shall be cancelled by said treasurer and returned to the proper officers of the township or city issuing the same." The township of Clarendon, in Michigan, having complied with the requirements of the act on its part, delivered to the state treasurer its bonds to the amount of $10,000, dated July, 1869, for the benefit of the Michigan Air Line Railroad Company. The company completed its railroad before February, 1871, and became entitled to the governor's certificate under the act; but on May 26, 1870, the Supreme Court of the State had declared the act to be unconstitutional, and the governor in consequence thereof refused to give the certificate. On the 28th May, 1872, before the expiration of three years from their delivery, the treasurer returned the bonds to the township. November 12, 1884, the appellant obtained judgment against the railroad company and an execution was issued, which was returned *nulla bona.* On the 24th February, 1885, he filed a bill in equity against the township and the company, claiming that the township was equitably indebted to the company to the amount of the bonds and coupons with interest, and that he was entitled to recover the amount of that indebtedness, and to apply it on his judgment debt. *Held,*

(1) That the municipal authorities had no power to deliver the bonds, after their execution, except to the state treasurer, and that the word " deliver " as used in the statute with reference to this act, was used in its ordinary and popular sense, and not in its technical sense;

(2) That to the governor alone was given the power to determine whether the bonds should ever in fact issue, and, if issued, when they should issue;

(3) That the endorsement by the treasurer upon each bond of the date of its delivery and of the person to whom it was delivered, was necessary to make it a completed bond, and that this could not be done until the governor's authorization was made;

(4) That as the bonds were never endorsed and delivered by the treasurer they never became operative;

(5) That the rule in regard to escrows could be applied to these

instruments because they were never executed in compliance with the peremptory requirements of the statute;

(6) That if the railroad company had any cause of action against the township by reason of these facts, it was barred at law by the statute of limitations of the State of Michigan;

(7) That by reason of laches in pursuing the remedy, the bar at law could be set up and maintained in equity.

The constitutionality of the act of the legislature of Michigan of March 22, 1869, which is considered in this case, was fully settled in the case of *Taylor* v. *Ypsilanti*, 105 U. S. 60, to which the court adheres.

ON the 24th of February, 1885, the appellant exhibited, in the Circuit Court of the United States for the Eastern District of Michigan, his bill, in the nature of a creditor's bill, against the appellees.

The bill averred that, on the 12th of November, 1884, the appellant obtained a judgment against the railroad company for the sum of $355,865.24; that an execution upon the judgment was issued, and was returned "*nulla bona;*" that the judgment was still unpaid; and that the railroad company was a corporation, organized on the 28th of August, 1868, by a consolidation of two companies — one organized under the laws of Michigan, and the other under those of Indiana, which consolidated company was itself, on October 8, 1880, again consolidated with the St. Joseph Valley Railroad Company, retaining, however, its name of the Michigan Air Line Railroad Company.

The bill also alleged that after the first consolidation as aforesaid, and on the 22d of March, 1869, the legislature of Michigan passed "An act to enable any township, city or village to pledge its aid, by loan or donation, to any railroad company now chartered or organized, or that may hereafter be organized, under and by virtue of the laws of the State of Michigan, in the construction of its road." Said act authorized the issue of aid bonds. In its fifth and sixth sections it provided as follows:

"SEC. 5. Whenever any such bonds as provided by provisions of this act shall have been issued as therein specified, the same shall be delivered by the person, persons or officers having charge of the same to the treasurer of this State, who

shall give a receipt therefor and hold the same as trustee for the municipality issuing the same and for the railroad company for which they were issued, and to be disposed of by said treasurer in discharge of his trust, as hereinafter provided.

"SEC. 6. . . . Such bonds shall be safely kept by such treasurer for the benefit of the parties interested, and be disposed of by him in the following manner — that is to say, whenever any railroad company, in aid of which any of such bonds may have issued, shall present to said treasurer a certificate from the governor of this State that such railroad company has in all respects complied with the provisions of this act, and is thereby entitled to any of such bonds, the same, or such of said bonds as said company shall be entitled to receive, shall be delivered to said company, the treasurer first cutting therefrom, cancelling and returning to the municipality the past-due coupons. The treasurer shall endorse upon each of said bonds the date of such delivery and to whom the same were delivered, and the same shall draw interest only from the time when so delivered; and the treasurer shall notify the clerk of the township or recorder or clerk of the city issuing the same of the date of the delivery of its bonds to such railroad company . . . And in case any bonds so delivered to said treasurer by any such township or city shall not, within three years from the time when the same were received by him, be demanded in compliance with the terms of this act, the same shall be cancelled by said treasurer and returned to the proper officers of the township or city issuing the same."

The bill further averred that, in conformity with the provisions of this act, the electors of the township, on the 21st day of June, 1869, voted to pledge the aid of the township by the loan of $10,000, to be paid by its 10 per cent bonds at par, upon certain terms and conditions in said vote stated, among which were, that the road should be located and constructed through said township; that the time of payment of each of those bonds was to be postponed a year in the event of the non-completion of the road-bed and the ironing before the 1st of November, 1869; and that the company would pay yearly

to the township a sum equal *pro rata* to the dividends paid stockholders; and said sums were to be in extinguishment of the interest on the bonds, and the excess over 10 per cent, if any, to be applied on the principal. The bonds, thus voted, were issued in pursuance of said act, and were delivered to the state treasurer, to be by him held as trustee for both the township and the company on the terms and conditions of the act, as aforesaid.

The bill then averred that the railroad company, in consideration of the township's action, and relying thereon, entered upon the construction of said railroad, and, previous to the 1st of February, 1871, had fully constructed and ironed said road through the township; and, at the time of the delivery of the bonds to the state treasurer, as aforesaid, had duly executed and delivered to the township the agreement specified in the terms on which the aid was voted, and had performed every condition precedent to the earning of said bonds, and had become fully entitled to have the same delivered by the treasurer, except that it had not secured the certificate of the governor as required by said act. While the road, however, was in the process of construction, the Supreme Court of the State of Michigan, on the 26th of May, 1870, declared the act in question to be unconstitutional; but as the railroad company had already expended the sum of a million of dollars, and upwards, in construction, it could not stop, but went on and completed the road in full compliance with all the conditions of the vote. The company then applied to the governor for his certificate under the statute, exhibiting to him proofs of its title to receive the bonds; but he refused to give the same, giving as his sole reason for such refusal the judgment of the Supreme Court aforesaid.

The bill then averred that on May 28th, 1872, the township, knowing the premises, and without the knowledge or consent of the company, and in violation of the law and of the trust aforesaid, and in fraud of the company's rights, induced the state treasurer, who had full knowledge of the foregoing facts, to surrender to the township the said bonds and the coupons thereunto attached; that the township had since retained the

same, and withheld them from the company; that said bonds and coupons, by reason of all the premises, became in justice and equity the property of said railroad company and the township became bound thereon according to their tenor and effect; that the said township was therefore equitably indebted to said company, to the whole amount of said bonds and coupons, with the interest thereon to the present time; and that the appellant was entitled to the said amount, towards the satisfaction of his judgment against the company.

To this end an account was prayed to be stated between the company and the township, the appellee, and a final decree against the township for the sum shown to be due, in favor of the appellant, was asked.

The bill was dismissed by the Circuit Court on demurrer (26 Fed. Rep., 805); and the cause came here on appeal by the complainant.

*Mr. John D. Conely* for appellant. *Mr. Alfred Lucking* was with him on the brief.

*Mr. W. K. Gibson* and *Mr. Isaac Marston*, for The Township of Clarendon, appellee.

MR. JUSTICE LAMAR, after stating the facts in the foregoing language, delivered the opinion of the court.

We consider the decisive question in this case to be that of the laches in pursuit of the railroad company's right against the township. In this view the controversy must be narrowed to a single issue. The township, which is the defendant below, and which defends separately, claims that the cause of action accrued either 13 or 14 years before this bill was filed — 13 years if the conversion of the bonds by the township and the treasurer be considered the gravamen, and 14 years if it be the governor's refusal to issue his official certificate; that since the statutes of limitation in Michigan, touching these questions, vary from 6 to 10 years, the cause of action is long since barred at law as to the railroad company; that it is, therefore, barred also in equity and lost by laches in its

assertion; and that since the appellant by this bill is prosecuting a demand in the nature of a garnishment, and the railroad company's right is barred both at law and in equity, therefore that of the appellant is also barred. The appellant seeks. to avoid the force of this position by claiming that the bonds had been so far perfected by the dealings between the parties that the railroad company was entitled to have them from the state treasurer; that such being the case, the tort of the township and of the treasurer in converting them could not impair the rights of the company; that, therefore, the company was and is entitled to waive the tort and sue directly on the bonds, as in the case of lost or stolen bonds; that only a few of such bonds, if delivered, would have been barred at the time of the filing of the bill, since most of them were so drawn as to mature within 10 years of that time; and, finally, that as the company was thus still in possession of an enforcible demand, the appellant could avail himself of it by this bill.

The controlling question presented, therefore, is this: Were the bonds in question so dealt with by the parties as at any time to vest in the railroad company a right to sue directly on the bonds themselves, as distinguished from a right to sue for their non-delivery, or because of their cancellation? That question cannot be satisfactorily or properly answered without constant reference to the exceptional character of the circumstances by which these bonds were deprived of their value. It is not the case of a common negotiable instrument put forth by a natural person as obligor; but it is that of a railroad aid bond sought to be put forth by the municipality. In such case the nature of the bonds, their force and effect, their value and character while in the hands of the state treasurer, the rightfulness and sufficiency of their issue, and all kindred questions, must be referred to the statute authorizing them. In this case the statute is the act of 1869. It is the touch-stone. Whatever might be the rule in ordinary cases, so far as the act goes, it controls here, being the enabling act; outside of it there was no power, whatever, to issue these bonds. By an unbroken current of decisions by this court and by all other courts, too numerous to mention, it is settled law that a municipality has

no power to make a contract of this character, except by legislative permission. It is manifest that, such being the case, the legislature in granting such permission can impose such conditions as it may choose; and even where there is authority to aid a railroad and incur a debt in extending such aid, it is also settled that such power does not carry with it any authority to execute negotiable bonds except subject to the restrictions and directions of the enabling act. *Wells* v. *Supervisors,* 102 U. S. 625; *Claiborne County* v. *Brooks,* 111 U. S. 400; *Kelley* v. *Milan,* 127 U. S. 139.

The analogy offered between the case at bar and a lost bond is misleading. There is, in fact, no analogy. There is no doubt about the right of the owner of a bond lost or stolen to sue on it, and in the absence of it to give secondary evidence of its contents; but the very statement of the principle assumes the existence of the instrument. A bond lost or a bond stolen is out of the personal possession and control of the owner, it is true; but it is also an instrument that has become executed — to which those things have been done that were needed to give it legal existence as an actionable obligation.

But here the very question to be determined is, whether there ever were any bonds. It is a question, in substance, of the very existence of the instruments themselves. As before remarked, the act of 1869 fixes the rights of parties in this case. All the questions concerning the execution of the bonds in controversy must be referred to that statute, tested by it, and decided in strict conformity with its terms. It is an enabling act, conferring a power not before existent, and any departure from its requirements cannot be allowed. *Harshman* v. *Bates County,* 92 U. S. 569.

In the case of *Sheboygan Co.* v. *Parker,* 3 Wall. 93, 96, this court said:

"The commissioners or board of supervisors of a county, in the exercise of their general powers as such, have no authority to subscribe stock to railroads, and bind the people of the county to pay bonds issued for that purpose without special authority conferred upon them by the legislature. But when special authority is given to the people of a county to do these

acts, and bind themselves by the issue of such bonds, the legislature may properly direct the mode in which it shall be effected. The persons specially appointed to act as agents for the people have a ministerial duty to perform in issuing the bonds, after the people, at an election held for the purpose, have assented that they shall be bound."

In the case of *Anthony* v. *County of Jasper*, 101 U. S. 693, the township of Marion had, by authority, subscribed in aid of the railroad. Afterwards the legislature passed an act requiring such bonds to be registered and certified by the auditor of the State. The court said (pp. 696, 697, 698):

"There can be no doubt that it is within the power of a State to prescribe the form in which municipal bonds shall be executed in order to bind the public for their payment. If not so executed they create no legal liability. Other circumstances may exist which will give the holder of them an equitable right to recover from the municipality the money which they represent, but he cannot enforce the payment, or put them on the market as commercial paper. The act now in question is, we think, of this character. It in effect provides that no bond issued by counties, cities or incorporated towns shall be valid, that is to say, completely executed, until it has been countersigned or certified in a particular way by the state auditor. For this purpose, after being executed by the corporate authorities, it must be presented to that officer, and he must inquire and determine whether all the requirements of the law authorizing its issue have been observed, and whether all the conditions of the contract in consideration of which it was to be put out have been complied with. To enable him to do this, evidence must be submitted, which he is required to file and preserve. If he is satisfied, the registry is made, and the requisite certificate endorsed on the bonds. This being done the execution of the bond is complete, and, under the law, it may then be negotiated, that is to say, put on the market as valid commercial paper. . . . When the bonds now in question were put out, the law required that to be valid they must be certified to by the auditor of State. In other words, that officer was to certify them before their execution was complete, so as to bind

the public for their payment. We had occasion to consider in *McGarrahan* v. *Mining Co.*, 96 U. S. 316, the effect of statutory requirements as to the form of the execution of patents to pass the title of lands out of the United States, and there say: 'Each and every one of the integral parts of the execution is essential to the validity of a patent. They are of equal importance under the law, and one cannot be dispensed with more than another. Neither is directory, but all are mandatory. The question is not what, in the absence of statutory regulations, would constitute a valid grant, but what the statute requires.' The same rule applies here. The object to be accomplished is the complete execution of a valid instrument, such as the law authorizes public officers to put out and bind for the payment of money the public organization they represent. For this purpose the law has provided that the instrument must not only be signed and sealed on behalf of the county court of the county, but it must be certified to or countersigned by the auditor of State. . . . In order to recover in this case it became necessary for the plaintiff to prove that the bonds from which the coupons sued on were cut had been executed according to law. He did prove that they were signed by the presiding justice and clerk of the court, and were sealed with the seal of the court. This, before the act of March 30, 1872, would have been enough, but after that more was necessary. The public can act only through its authorized agents, and it is not bound until all who are to participate in what is to be done have performed their respective duties."

The bonds in that case were declared void. See also to the same effect *Coler* v. *Cleburne*, 131 U. S. 162.

Turning now to the statute involved in the case at bar, we find its directions, among others, to be as follows:

" Such bonds shall bear interest at the rate of not exceeding ten per cent, per annum, and shall have attached thereto the necessary and usual interest coupons, corresponding in dates and numbers with the bonds to which they are attached, which shall be signed by written signatures by the same person or persons executing such bonds. Such bonds shall, if issued by a city, be executed by the mayor and clerk or recorder

thereof, as the case may be, under the seal of the said city;
and if issued by a township, they shall be executed by the
supervisor and clerk thereof; and if any city or township issu-
ing such bond shall have a seal, the same shall be impressed
upon each of such bonds. The bonds and coupons attached
thereto shall be payable at the office of the treasurer of the
county in which such township or city may be situate. When-
ever any such bonds as provided by provisions of this act shall
have been issued as therein specified, the same shall be deliv-
ered by the person, persons or officers having charge of the
same to the treasurer of this State, who shall give a receipt
therefor and hold the same as trustee for the municipality issu-
ing the same and for the railroad company for which they
were issued, and to be disposed of by said treasurer in dis-
charge of his trust as hereinafter provided. Upon receipt of
any such bonds from any township or city in aid of any such
railroad company, the treasurer of this State shall immediately
register or record the same in a book or books to be kept by
him for that purpose in his office, which record shall show the
amount, date and number of each bond, the rate of interest
which it bears, by what township or city issued, to the benefit
of what railroad company the same are issued, and the time
when payable, which record shall be always open for the in-
spection of any citizen of this State or other interested person.
Such bonds shall be safely kept by such treasurer for the bene-
fit of the parties interested, and be disposed of by him in the
following manner; that is to say, whenever any railroad com-
pany, in aid of which any of such bonds may have issued,
shall present to said treasurer a certificate from the governor
of this State that such railroad company has in all respects
complied with the provisions of this act, and is thereby en-
titled to any of such bonds, the same, or such of said bonds
as said company shall be entitled to receive, shall be deliv-
ered to said company, the treasurer first cutting therefrom,
cancelling and returning to the municipality the past-due cou-
pons. The treasurer shall endorse upon each of said bonds
the date of such delivery and to whom the same were deliv-
ered, and the same shall draw interest only from the time

when so delivered; and the treasurer shall notify the clerk of the township, or recorder or clerk of the city issuing the same of the date of the delivery of its bonds to such railroad company. . . . And in case any bond so delivered to said treasurer by any such township or city shall not, within three years from the time when the same was received by him, be demanded in compliance with the terms of this act, the same shall be cancelled by said treasurer and returned to the proper officers of the township or city issuing the same."

A critical analysis of this statute indicates this to have been the plan: In the preparation and perfecting of the plan persons described by certain official titles, and probably selected because of their titles, were to participate.

(1) The bonds were to be "executed;" that is to say, written or printed, signed and sealed by the supervisor and clerk of the township. Here the powers of those persons ceased. They could not perfect the instruments by delivery. The word "executed," used in the statute in connection with the acts mentioned, manifestly does not import the *final* delivery; for that is expressly directed to be done by the treasurer. Such delivery as they could make was clearly not the technical delivery needed to complete the bonds as negotiable instruments, because the power to hand over to the payee was not conceded to them in any event. The delivery which they were directed to make to the treasurer in his capacity of statutory trustee was only such as amounted to a "giving up" or the "committing" of them to the treasurer for his safe-keeping. The word was used in its ordinary and popular sense, not in the technical one.

(2) To the governor, and the governor alone, was given the power to determine whether the bonds should ever in fact issue, and if issued, when they should issue. For to him was committed the decision of the important question whether the railroad had performed its part of the common undertaking. His certificate was to be the evidence of that fact, and the only admissible authentication of it to the trustee, the depositary. So far as the investigation and determination of that question were concerned and the certifying of it, the governor was to

discharge that function in the process of issuing the bonds which was imposed on the auditor in the case of *Anthony* v. *County of Jasper, supra,* the difference being that in that case the certificate was to be endorsed on the bonds themselves, but not so in this case.

The State treasurer was appointed to be a trustee for both the township and company ; to receive the bonds ; to register them ; and to finish their clerical execution, using the word in its popular sense, by his endorsements on them of the date of delivery, and of the person to whom delivered.   Such endorsements are clearly a part of the very form of the completed bond, as laid down in the *Jasper County case, supra.*   He was also to cancel them, and to return them so cancelled to the township authorities if not demanded in three years ; and, finally, if demanded in compliance with the terms of the act within the three years, to complete their execution (using the word in its technical sense) by delivering them.   Such, as we understand it, was the intention of the legislature.   If it be said that such details are useless and technical, a sufficient answer is, so the statute is written ; and the courts cannot unmake or modify it.

As already shown, the legislature in this class of cases has the right to provide the processes by which the contract is to be perfected.   Moreover, we do not think these details are either useless or technical.   When it is remembered that the whole policy of allowing contracts of this class has been deprecated by some of the oldest publicists and jurists, and that the negotiable form of such bonds has often led to the imposing of great burdens on municipalities for which there has been no return, we are not disposed to criticise the care of a legislature to establish a system of even rather severe checks as a condition to its concession of such extraordinary powers.

The appellant claims that the bonds were perfected instruments when delivered to the state treasurer — that the ministerial duties had been performed in full.   The argument proceeds largely upon the idea that, as to this transaction, the township and its agents, the supervisor and clerk, were a complete and rounded organism, distinct from the state treasurer,

and capable of dealing with the treasurer as if he were a third party — in making delivery to him, for instance. We do not so regard it. All the steps directed by the statute to be taken leading up to the final act of delivery to the railroad company constitute one progressive process. To adopt the language of the court in the *McGarrahan case, supra,* " each and every one of the integral parts of the execution is essential to the validity of the bond."

We hold, therefore, that, since the bonds were never endorsed and delivered by the treasurer as required by the statute, they never became operative. The act of delivery is essential to the existence of any deed, bond or note. Although drawn and signed, so long as it is undelivered it is a nullity ; not only does it take effect only *by* delivery, but also only *on* delivery. *Bayley* v. *Taber,* 5 Mass. 286 ; *Marvin* v. *McCullom,* 20 Johns. 288 ; *Ward* v. *Churn,* 18 Grattan, 801 ; *Lovejoy* v. *Whipple,* 18 Vermont, 379.

The appellant, however, contends that these bonds were, in effect, delivered — that " by the delivery to the treasurer and by the performance of the conditions the title to the bonds vested in the company, the state treasurer holding them as trustee for the township and for the railroad company." We cannot concur in this view. The law in reference to escrows seems to be involved in some uncertainty. What the effect is of a performance of the conditions by the grantee, the instrument remaining in the hands of the depositary — whether, in such case the second delivery by the depositary is or is not necessary to give effect to the deed — are questions about which the courts yet differ. But concede the appellant's position to be correct, as a general rule, yet that general rule does not necessarily control this case. These are extraordinary instruments, and certain fundamental questions of power to contract and of details of execution underlie any action brought upon them, which render the usual rules in regard to escrows very unsafe guides. Too much stress cannot be laid on the necessity for consulting the statute.

Even in the case of an ordinary escrow, nothing passes by the deed until the condition is performed. *Calhoun County* v.

*American Emigrant Co.*, 93 U. S. 124. Here the condition prescribed by the statute as that upon which the delivery was to be made to the railroad company, and on which the bonds were to be perfected instruments in its hands, was never performed. On this point the statute seems to be very simple and clear. Indeed, it would be difficult to make it more clear. By its very terms, the bonds received by him in their uncompleted condition were to be by the state treasurer "safely kept;" and for three years after their reception could only be parted with by him in one way — that is, to the railroad company interested, on its production of the governor's certificate. On that condition could they be delivered, not on any other. The certificate was not a mere formal act on the part of the governor, but was a condition precedent to the power of the treasurer to deliver. The statute is not only emphatic on this point, but also repetitious in its emphasis. Section 5 says, the bonds are "to be disposed of by said treasurer in discharge of his trust as hereinafter provided;" and section 6 provides that "such bonds shall be safely kept by such treasurer for the benefit of the parties interested, and be disposed of by him in the following manner; that is to say, whenever any railroad company . . . shall present to said treasurer a certificate from the governor," etc.; also, that "in case any bond so delivered to said treasurer . . . shall not within three years . . . be demanded in compliance with the terms of this act, the same shall be cancelled by said treasurer," etc. The certificate was designed to be the treasurer's sole authority to deliver. The question whether the railroad company had "in all respects complied with the provisions of this act" was one that he could not inquire into except by consulting the governor's certificate. This was his only and conclusive evidence, by the very terms of the statute. The company's compliance with the provisions of the act gave it the right to receive the governor's certificate; but it did not confer the right to receive the bonds. That was given by the governor's certificate alone. Had the treasurer made delivery without the certificate, he would have acted without authority of law, and the bonds would have been voidable in the hands of the company. *An-*

*thony* v. *County of Jasper, supra.* These requirements are not novel. They are matters of administrative detail fixed by the statute. We cannot declare them to be merely directory, or annul them by construction. It does not matter, so far as the question of the statutory power of the treasurer is concerned, that the failure of the company to produce the certificate might not be because of any fault in the company. A failure might be due to the governor's mistaken view of the law, or to his misconception of the facts, or even to his wilful refusal to discharge his official duty — all is immaterial to this aspect of the statutory scheme. A miscarriage in this particular was one of the risks taken by the company. The company knew the statute — was held by the law to know and understand it. It contracted with the township through the statute, and could so contract with it in no other way. Availing itself of the statute, it must take it *cum onere.* If the governor failed to give the certificate when he should, and could not be reached by a mandamus, those were but features of the company's risk.

There is another provision of the statute in question which supports the foregoing views. It is the direction that when the treasurer should make the delivery to the company he should cut the over-due coupons from the bonds and cancel them; and that he should at the same time endorse the bonds with the date of that delivery, from which date the bonds should bear interest. Had the legislature inserted in the statute a declaration, in set and formal phrase, that it should be the issue of the bonds on the governor's certificate and not the completion by the railroad company of the portion of its contract that should perfect the bonds and give them effect; such declaration would not, in any degree, be clearer than this provision. *Lovejoy* v. *Whipple, supra.* It is to be observed that no question arises in this case of a *bona fide* purchaser of bonds improperly issued. The appellant stands exactly in the shoes of the railroad company, and his rights are no greater. *Smith* v. *Bourbon County,* 127 U. S. 105.

Holding these views, it is unnecessary to pursue this discussion further. Whether the railroad acquired a cause of action against the township by the failure to deliver the bonds, or by

their cancellation prior to the lapse of the three years fixed by the statute, on the one hand, or the whole project was a mere fiasco, on the other, and, if such cause of action arose, what was its precise nature and form — are matters rather of curious speculation than of practical consequence. If no real cause of action arose, that is the end of the matter. If it did arise, then its form and nature are immaterial, since all forms are barred alike, being actionable as of the then date. Is is not even suggested that any other method exists by which to escape the bar save the one considered and hereinbefore rejected. We consider the question of the constitutionality of the act of 1869, herein mooted again, to be fully settled by the case of *Taylor* v. *Ypsilanti*, 105 U. S. 60; but this case is decided on other grounds, and it is unnecessary to dwell on that question.

It is further claimed by the appellant that the bonds in question were invested by the statute with the character of trust property, and that, therefore, they can be followed into any hands to which they may be traceable; and that that right is not subject to the limitation prescribed for a conversion. To this view there are two answers; first, the fact that the bonds were never perfected instruments, as already decided; and, while the treasurer returned them cancelled a few weeks prior to the lapse of the three years fixed by the statute, that error became immaterial from this point of view so soon as the three years did expire; secondly, the laches of the railroad company in pressing what claim it may have had. *New Albany* v. *Burke*, 11 Wall. 96.

We apply the doctrine of laches to this case with the less reluctance, because after all we see but little of substantial merit in the bill. The scheme contemplated was a loan not a donation. A loan on rather indifferent security, perhaps; but a loan nevertheless. While therefore it is possible that a loan may be so proposed and accepted as to give to the intended borrower a cause of action for any failure to perform the agreement, and a right to recover damages at law, yet on a bill in the nature either of a bill for specific performance, or for an equitable garnishment, the court may well inquire where is the substantial equity in the case.

The decree of the Circuit Court is　　　　　*Affirmed.*